MILLER and others *v.* RIDGELY.

*(Circuit Court, W. D. Tennessee. February 6, 1885.)*

NEGOTIABLE INSTRUMENTS—PROMISSORY NOTES—IRREGULAR INDORSEMENTS.

A blank indorsement, by a stranger to the note, made before delivery to the payee, to secure to him a pre-existing debt of the maker, and extend the time of payment, binds the indorser as a joint maker under the rule of the supreme court of the United States, and as a guarantor under the rule in Tennessee and Texas, where the parties respectively resided. The perplexities of the law on this subject considered, and the opinion expressed that the confusion would have been avoided by adherence to the common and commercial law of England, by which the indorser would be held liable as between him and one subsequently taking the note from the payee, but as between the original parties, only as a guarantor, which latter liability would fail because of the statute of frauds.

### FINDING OF FACTS BY JUDGE HAMMOND.

This case is submitted without a jury, under the statute. The criticisms of some of the proof by counsel of both parties is plausible enough, but it is unnecessary to consider the evidence with any detail in reference to that criticism. Probably each party has stated his testimony, as is usual with interested witnesses, in the most favorable light possible for his side. But, after all, there is no conflict of *evidence* in the testimony of the parties themselves, though there is a very radical conflict of *theory*, which at last is only the troublesome one of *law* that always arises in cases like this, be the facts what they may. Neither Miller nor Ridgely testifies to any fact within the knowledge of the other, for they were separated many hundreds of miles, and the transaction between them was a very simple one, had through an interested intermediary whose testimony was impeached, not by direct proof of untruthful character, but by evidence to contradict his statements of the facts, and was supported by evidence of his good character, taken subject to exception. Whatever may be the rule elsewhere, I am inclined to think that in Tennessee the evidence is admissible. *Richmond* v. *Richmond,* 10 Yerg. 343; Stevens, Dig. "Evidence," 189, and notes. But it is immaterial here, for reasons that will presently appear, to decide this point.

The testimony of this witness corroborates that of the defendant, and, if he tells the truth, the plaintiff's statement of the facts is contradicted. But the plaintiff and defendant can be perfectly reconciled in their respective statements on the theory that this doubtful witness has deceived them both, which I believe to be the fact. This accounts for the peculiarities of the case, and in no other way can the conviction be escaped that either the plaintiff has sworn falsely, or both the defendant and this witness have done so.

The defendant is known to the court, trying this case without a jury, as he would be to any jury of this county, and possibly of the district, as a man of such character that he is not likely to swear falsely, and the court assumes that the plaintiff is of the same standing where he lives. His statement, so far as it relates to the intention *he* had that the defendant should pay this note at maturity, if not then paid by Bond, is consistent with the ordinary course of business in such transactions as this, and with his actions in relation to the note. Long before it became due, he wrote to the defendant, asking him to pay it at a discount; and he sent it forward for collection *of the defendant,* at maturity, having been informed by letter from Bond that he could not himself pay it. It is true that a thoroughly dishonest man, under the obligations of a contract such as Ridgely intended to make and supposed he was undertaking, might take advantage of the fact that the contract was not in writing, and of the implications of law in favor of blank indorsements, and act as the plaintiff did, notwithstanding the true nature of the contract; and if

Bond tells the truth, this is what the plaintiff has done, and there are some slight circumstances tending to corroborate this view, if it be assumed in advance that the plaintiff was dishonest enough to adopt that scheme. But these circumstances are also reconcilable with an honest purpose. Thus, if it be true that the plaintiff supposed Ridgely was liable as maker, or guarantor or "surety," on the note, as he puts it, there was no reason for proceeding to protest it as if Ridgely was an indorser. He speaks of it in his two letters to Ridgely as an *indorsement,* and it is so termed in correspondence with the bank at Memphis; and he evidently thought of and treated the liability as that of an indorser. Again, if the plaintiff intended, as he testifies, that Ridgely should sign the note on the face as maker jointly with Bond, and with that intention used the pronoun "we" in the note, it is somewhat singular that, when it was delivered to him with only Ridgely's indorsement thereon, he did not return it to be properly signed according to his contract with Bond, and, being a banker, the plaintiff might be supposed to know of the difficulties attending such irregular indorsements. And the suspicion here is somewhat strengthened by the fact that Bond kept his account with him as "C. H. Bond & Co.," and the pronoun "we" would be grammatically as necessary in a note to be given in that name as it would be if Ridgely were also expected to sign it as maker.

But it must be remembered in this connection that mere prudence might dictate to a banker, holding such an irregular indorsement, to fix the liability in that capacity by demand and notice of protest, even if he knew or believed that the liability was a fixed one without such protest. Again, the use of the pronoun "we" is not inconsistent with an intention that Ridgely should be maker; and the most that can be said is that the force suggested by its use in establishing the intention to which the plaintiff swears, is broken by the fact that without such intention he would also have used that pronoun. Moreover, Miller does not swear that it was agreed by Bond and himself that Ridgely would sign on the face of the note as maker, but only that such was his own intention; the understanding between him and Bond being that Bond's uncle "would go on the note to secure us." He nowhere says that there was any distinct agreement between them as to the character of the liability.

The truth is, I have no doubt, that no one of the parties to this transaction had the least conception of the difficulties arising out of irregular indorsements, or intended this to be of irregular character. Ridgely, no doubt, intended to *indorse* the note, as perhaps with the rarest exceptions—as when a maker for want of room on the face writes his name on the back—almost every man does who writes his name in blank on the back of a note; and Miller, who had an old debt on an insolvent man which he was anxious to secure in any form, was not particular as to the precise character of that security. He no doubt expected, after the usual custom with country banks, to have

the "surety" sign the note jointly with the maker, but was glad enough to get the signature in any form, and hence did not return it to have his own intention complied with, supposing that by regular demand and notice of protest he could fix the liability as indorser and save his debt, not knowing till the matter came into the hands of the lawyers that there was difficulty in that treatment of the transaction. On the other hand, Ridgely was just as ignorant as Miller of the true legal effect of what he was actually doing. He does not pretend that he did anything but indorse the note, and nothing was further from his intention than becoming a maker jointly with Bond. He had been informed by Bond that Miller had agreed to extend further banking facilities for a year to enable him to pay the note, and that Miller had promised not to call on him for payment unless Bond should die without paying it. He indorsed in the belief that he had made that contract; an anomalous one, to be sure, but the defendant is just the man to make it and to refuse any other. The mistake he made was in not writing it over his signature.

The suspicions urged against this testimony, like those against the plaintiff's, may be disposed of in the same way. It is unfortunate that the correspondence between Ridgely and his nephew, by which this transaction was carried on, is not produced. But the defendant accounts quite satisfactorily for the loss of the letters he received. He is one of a firm of merchant tailors; these letters did not go upon the files of the firm, for they had no business there. His habit was to place his individual letters in the "button-drawer" of the table at which he worked, and in cleaning up they were thrown into the fire, the importance of keeping them not occurring to him; and Bond, in his numerous removals, since he left Texas, has lost or mislaid the letters to him. He fully corroborates his uncle as to the contents of the letters, but as to negotiations with Miller, he is contradicted by wholly disinterested witnesses, who heard what occurred. He seems to have produced at the bank one of the letters from his uncle, and to have stated its contents. It was not read by Miller, or those present, and only in part by Bond. These witnesses testify that neither in the negotiations between Miller and Bond about the note, nor in his report about his uncle's letters, was anything said of Ridgely's not being liable, except in case of Bond's death, or about an extension of bank facilities for another year, but only, in a general way, that his uncle would "go security" on his note. None of the other witnesses in this case is contradicted, or otherwise impeached; and, while those offered to support his character all swear it was good, and that they would believe him on oath, there are indications that before this transaction, and while he lived in this city, his reliability as a witness was talked about, if not questioned, by those who had occasion to speak of it. At the time this note was given, he was in very straitened circumstances, caused by speculations in cotton futures, some of which were concealed from his bankers, and was very anxious

to continue business, and hopeful of doing this if he could secure the old balance. It is a fair inference, from all the circumstances, that he deceived both his uncle and Miller, by misleading the former as to his own understanding with Miller and as to his promises, and the latter by concealing from him the conditions which his uncle attached to his agreement to indorse the note. On no other theory can the testimony of witnesses, whom the court is not authorized to doubt, be reconciled, and by this it is entirely harmonized. At all events, the court cannot, on Bond's uncorroborated testimony, say that the defendant has answered the burden of satisfactorily proving that Miller, when he took this note indorsed by the defendant, knew of the conditions he attached to that indorsement, or of his intention not to be bound by it, except in case of Bond's death.

As to the agreement by Miller to extend further banking facilities for a year, a circumstance exists tending to corroborate Bond and excite some suspicion that Miller was fruitful of promises; or, at least, encouraged hopes of indulgence as long as these were necessary to assure the coveted indorsement of Ridgely as security for the old balance. He swears positively he did not agree to extend further facilities for the next season, but he did extend Bond's account to August 30, 1882, and the latter now owes him on these transactions, in addition to the note, a further sum of $2,809.15, only $376 of which can be connected with the old account, because of losses on cotton on hand at date of the note. Bond's complaint is that Miller "shut down on him" in violation of his agreement to give him a chance to work out the note; and in view of the facts that this account, from May 12, 1881, aggregates over $300,000, and that Miller trusted Bond so largely, I have a strong suspicion that this complaint is well founded. But it may have been a hope rather than a promise. Miller says he made no *agreement*, but was willing to indulge Bond in the hope that he would work out, until he found it imprudent to further trust him. This is a reasonable explanation, consistent with the ordinary course of business, and, in the absence of more satisfactory proof, the court must accept it as true. Bond converted his and Miller's expectations into promises in negotiating with his reluctant uncle, and no doubt the creditor, while he had hope of securing an old balance. was not very discriminating between great expectations and promises. With this general commentary upon the main features of the evidence, made necessary by the peculiarities of this case, it remains to formulate the result of my deliberations by stating the essential facts upon which the rights of the parties must depend:

(1) The defendant indorsed in blank, a few days after its date, the note sued on, which, a few days later, was delivered to the plaintiffs by C. H. Bond & Co., and accepted in payment of a balance then due by said C. H. Bond & Co. to the plaintiffs on an open account of dealings between them as merchants and bankers. The note is as follows:

"$2,500.                              BELTON, TEXAS, February 1, 1882.

"Twelve.months after date we promise to pay to the order of Miller Bros. twenty-five hundred dollars at their office in Belton, Texas, with interest at the rate of eight per cent. per annum from maturity until paid, value received.

                                                "C. H. BOND & Co.

"Indorsed:  S. E. RIDGELY."

(2) When the note was due, it was protested for non-payment, and notice was sent to the defendant at Memphis, Tennessee, where he resided.

(3) There was no other consideration for the note than the balance due the plaintiffs, as bankers, from C. H. Bond & Co., merchants, on an account arising out of dealings previously had between them, and the extension of the debt for the 12 months the note had to run to maturity.   The defendant in no way participated in that consideration, or received any benefit from it.

(4) C. H. Bond was a nephew of defendant, and doing business in Texas as a cotton merchant.   At the date of the note he owed the plaintiffs a balance of $2,500 on a banker's account, aggregating some $300,000, from May 12, 1881, to the date of the note, which balance plaintiffs had demanded that he should secure before any further facilities would be extended.   He expressed the belief that his uncle at Memphis "would go on a note" at 12 months, and thereupon opened negotiations with him by mail.   He informed the plaintiffs, just previous to the date of the note, that his uncle "would go his security on the note," and thereupon the plaintiffs, in their banking office, on the day of its date, prepared the note sued on, and it was signed by Bond in the name in which he did business, and by him sent in the mail to his uncle at Memphis, where it was indorsed and returned by mail to Bond, who, about February 11, 1882, delivered it to the plaintiffs.

(5) The plaintiffs expected and intended that the defendant would sign as maker, jointly with C. H. Bond & Co., but they had no distinct understanding with Bond or the defendant to that effect.   Their only agreement with Bond was that they would take a 12-months note with his uncle "as security."   They accepted the note, as it was handed to them by Bond, without complaint as to its form, and subsequently, in their correspondence and otherwise, treated it as an indorsement by Ridgely.

(6) The defendant at first refused his aid to his nephew, but being assured by his letters that "he had received a sacred promise from plaintiffs that he should never be called on for payment, except in case of Bond's death without paying it, and that their only purpose was to provide against that event, as he had made arrangements to continue business with plaintiffs, who promised to extend all necessary facilities," he indorsed the note with no other intention than to make that contract.

(7) Bond did continue business with plaintiffs until August 30,

1882, when his account was again in balance against him, and, plaintiffs refusing further credit, he made an assignment and left the state.

(8) The note has never been paid, Bond being unable, and the defendant unwilling, to pay it.

*H. C. Warinner,* for plaintiff.

*L. Lehman,* for defendant.

HAMMOND, J. On the facts of this case, very much against my own opinion, and with a sense of its injustice, I feel constrained by authority to pronounce judgment for the plaintiffs. Outside the statute of frauds, the defendant would, under the ordinary law of contracts, be held liable only to the extent of his agreement, or else the contract would wholly fail for want of that consent of the two minds necessary to make a contract effective as between the parties to it. I am unable to see any sound and satisfactory reason why this transaction is not within the statute of frauds, which enacts that "no action shall be brought whereby to charge the defendant upon any special promise to answer for the debts, default, or miscarriage of another person, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him thereunto lawfully authorized." Code Tenn. (T. & S. Ed.) § 1758.

If the defendant had taken the precaution to write his actual contract above his signature, he could not be held beyond it, whatever may have been the plaintiffs' intentions or expectations; and why should he now be so held? If he had thus written it, and the plaintiffs accepted it, both would have been bound by it; if it were not in accordance with the agreement or understanding with Bond, they could have refused acceptance, and been in no worse situation than they already were, or could have insisted on a compliance with that agreement. Here were creditors anxious to secure an antecedent debt on an insolvent man; anything they could get in the way of security was better than nothing. The defendant was in no sense, legal or moral, bound to become liable for it; nor was he, in becoming surety, limited to any particular form, but could prescribe his own terms. He sought to fix those terms, and signed the note in the confident belief that he had done so. And yet, in aid of these creditors, we find the courts ignoring the statute of frauds,—ignoring the actual intention of the surety, and, by a system of judicial legislation, binding him to an arbitrary contract he never made, and that the creditors never supposed he had made, until advised, perhaps, by their lawyers to that effect; for the plaintiffs always treated it as an "indorsement," as no doubt the defendant thought it was. It is just the case that falls within the letter and policy of the statute of frauds, and illustrates its wisdom.

In my judgment, there is nothing in the commercial law of nego-

tiable instruments demanding that this case shall not be governed by the statute of frauds. Such is the law of England, whence we derive our own, and where the defendant could not be held as maker or indorser, for the obvious reason that he was in fact neither, but only as a guarantor,—no matter what the terms of the guaranty may have been, whether of absolute payment at maturity as plaintiffs insist, or conditionally as defendant intended to be bound,—which liability could not be enforced because the contract is not expressed in writing. "He is not liable at common law as a surety, because of the statute of frauds; and he is not liable by the law-merchant, because he has not followed the law-merchant." 1 Daniel, Neg. Inst. (3d Ed.) § 714a; 1 Ames, Bills & Notes, 243; 2 Ames, Bills & Notes, 839; *Steele* v. *McKinlay,* L. R. 5 App. Cas. 754, 772, 783; *Macdonald* v. *Whitfield,* L. R. 8 App. Cas. 733, 748.

In *Steele* v. *McKinlay, supra,* is a very instructive statement showing how the English commercial law has modified the old foreign lawmerchant as to the liability called an *aval,* which held any stranger, who lent his name to the paper, bound as an *underwriter* in the capacity in which he so lent it, whether he placed his name on the paper itself or on a separate paper; and he incurred his liability by writing his name under that of the drawer, acceptor, or indorser, and was held according to the place where he put it; owing, however, to the statute of frauds, this never operated in English law between the original parties to the paper, but *"solely for the benefit of those who take subsequently;"* and the cases holding otherwise are pronounced unsound. Hence, under the English law, the defendant here could be held only as a second indorser to one who took the note from the plaintiffs with their name written above it, and he could not rely upon the statute of frauds, for the reason that his indorsement would then appear to be regular, and he could be justly held according to its import. But the English law goes no further than this; and if our American courts, in their struggles with this question, had so confined themselves, there would not now exist the pitiable confusion exhibited in having neither the old law-merchant, nor the English modification of it, but a nondescript law-merchant, which differs so materially in the several states that there are almost as many rules of decision as there are states, that no two writers agree upon a classification of them, and that scarcely any state court of last resort has uniformly adhered to any given rule of decision. Mr. Daniel has boldly suggested a new way out of these bogs of the commercial law, which is interesting because new. 1 Daniel Neg. Inst. (3d Ed.) §§ 707–716, 714; 4 South. Law Rev. (N. S.) 539; 20 Amer. Law Reg. (N. S.) 331; 16 Amer. Law Reg. (N. S.) 649.

Those "who do not follow the law-merchant" should not expect any aid from it, and these *irregular* indorsements are not in accordance with it until they have assumed the regular form of the welldefined contracts of the law-merchant. Any attempt to assimilate

them to the regular forms of contract leads to confusion, as our American authorities abundantly illustrate. The regular contract, whether in blank or not, is as well understood as if it were written out word for word, and though blank as to form, is, in legal effect, written in full. It is not, therefore, within the statute of frauds, and is protected against parol evidence as other written contracts are. But the same treatment cannot be applied to these irregular blank indorsements, unless the legislature or the courts can write a uniform and well-understood contract above them; the former might, but certainly the latter have not been able to agree on such a contract, and we have the remarkable exhibition of a variety of artificial and wholly arbitrary rules of decision as perplexing as it is possible to make them. If parol testimony is to be at all admitted to show a contract, I cannot comprehend why it shall not be admitted at large to prove the real contract, or that there was, in fact, no agreement of the minds; nor why it should not be enforced or fail according to the proof. But this is not what the courts do; they admit parol proof only for the limited purpose of enabling them to make a choice as to the form of the liability. If they choose to hold him as indorser, he may defend by showing that there was no demand and notice; if they conclude to hold him as a guarantor, he is not permitted to show the actual terms of his guaranty, but held to an absolute one, except, perhaps, in some states, he may show that he was only a guarantor of solvency; and if they decide to hold him as maker, there is no escape for him, although he had no more intention of becoming a maker of the note than he had of becoming the architect of a new system of commercial law.

Where the object is to prevent one from escaping his contract, who actually intended to become a first indorser or a maker, but by a blunder did not sign a proper paper in the proper place, there may be some excuse for a wish "to baffle such a defense," though Lord BLACKBURN, in the opinion before cited, thinks it better, even in such cases, to adhere to the law. But this desire to impose some liability upon the irregular indorser has led the courts to an exaggeration of that doctrine. For example: in this case it may be true, as stated by Mr. Justice COOPER in one of the Tennessee cases, that the defendant intended to be bound in some form, and that he should be held to some liability; but it does not follow from this that he should be held bound to one of the three, or at most four, forms of contract, namely, as maker, as second indorser, as guarantor of payment at maturity, or as guarantor of payment when the holder fails to collect of the maker. Why may he not be held to the contract he made, namely, that he would pay if the maker should die without payment, or according to any other condition he might attach? If it be said that this was not the plaintiff's contract, the reply is, that, if he accepted the indorsement, such was his contract; for the indorser's consent is as necessary as his own, which will be implied from his acceptance, or else

v.22F,no.15—57

there was, in fact, no contract, because the parties did not, in fact, agree to anything.

As I understand the class of cases to which *Boyer* v. *Boogher*, 11 Mo. App. 130, belongs, this may be done if the indorser can prove that the payee of the note had knowledge of the particular conditions attached by him to the indorsement, but not otherwise; but I am unable to see why the payee should be more under the protection of the law than the other party to the contract, or why he may fill the blank space above the signature with a more absolute and a different agreement than that which the party signing intended to write therein. No man should be bound, beyond his actual intention, upon an arbitrary implication of some other intention, unless the law, as in the case of regular indorsements, fixes an invariable contract to be always implied from a blank signature. Confessedly, it does not do this; and while it opens the case to parol proof of intention, it illogically denies to him the privilege of proving any intention different from that of the other party, and often implies one wholly foreign to himself. In the effort to make efficacious that which, in itself, expresses nothing in particular, the cases build, upon facts and circumstances surrounding the transaction, some contract which does not express the actual intention of the surety, but that of the court which tries his case, according to its view of what ought to have been expressed; and scarcely any two agree about this on the same state of facts. Parol proof is admitted to aid the courts in determining what they shall make the blank mean, but not to help the parties in showing what it means in fact.

Still more illogically, some cases hold that the defendant here could not prove his conditional guaranty because *that* would be within the statute of frauds, while the courts may imply an absolute guaranty which the defendant did not make, and *that* is not within the statute. No such distinction exists in the terms of the statute, and if one be within it, I do not comprehend why the other is not. Such confusion cannot be beneficial to commercial intercourse, and the policy of the statute for preventing frauds and perjuries is reversed for one encouraging them.

On my independent judgment, I should hold that according to the common law, which is the substratum of all our laws, this contract would either fail for want of mutual understanding of the contracting parties, or be enforced as an acceptance by the payee of the terms attached to his contract by the guarantor, and that effect could not be given to any guaranty not expressed in writing, because the statute of frauds has forbidden it; and that until the payee had indorsed this note and transferred it to some stranger to the original contract, the blank indorsement of the defendant would not fall within the law-merchant. This was originally the law of Tennessee, but it has been changed by later decisions which would now hold the defendant as a guarantor. *Cahal* v. *Frierson*, 3 Humph. 411; *Comparree* v. *Brock-*

*way,* 11 Humph. 355; *Clouston* v. *Barbiere,* 4 Sneed, 338; *Newell* v. *Williams,* 5 Sneed, 212; *Talley* v. *Courtney,* 1 Heisk. 718; *Brinkley* v. *Boyd,* 9 Heisk. 152; *Iser* v. *Cohen,* 1 Baxt. 423; *Rivers* v. *Thomas,* 1 Lea, 649; *Taylor* v. *French,* 2 Lea, 257; *Harding* v. *Waters,* 6 Lea, 324. So would he be held in Texas, as I understand the cases there. *Cook* v. *Southwick,* 9 Tex. 615; *Carr* v. *Rowland,* 14 Tex. 275; *Chandler* v. *Westfall,* 30 Tex. 477.

But, according to the rulings of the supreme court of the United States, which follow the Massachusetts rule, somewhat regretted in *Essex Co.* v. *Edmands,* 12 Gray, 273, the defendant is to be held as a joint maker of the note, the case falling within the first category enumerated by Mr. Justice CLIFFORD, in the two cases cited from that court. *Rey* v. *Simpson,* 22 How. 341; S. C. Law Pub. Co. Ed. 260, and note; *Good* v. *Martin,* 95 U. S. 90.

Judgment for plaintiffs.